May it please the Court, Sheridan Green for Petitioner, Mr. Gomez. Your Honors, I will address three issues in this case. The first issue is whether Mr. Gomez was admitted to the United States on March 1, 1993 at the Houston Intercontinental Airport. Whether this is a question of law or a question of fact, we prevail either way. If it's a question of whether Mr. Gomez submitted sufficient evidence of his admission, then any reasonable adjudicator would have been compelled to conclude that he did. And if it's a question of whether that evidence as a matter of law constitutes an admission, then there are two BIA cases on point, a matter of Quilanton and a matter of Arreguin, which hold that the facts, as I have just stated, constitute an admission as a matter of law. Did you begin by talking about his passport and what it did or did not disclose and what the law says about what customarily would happen to one's passport in a trip such as the one that's alleged here? According to the regulations, Judge Smith, what is supposed to happen with a temporary resident when they seek entry into the United States is they're supposed to be admitted if they've been out of the U.S. for less than 30 days, which Mr. Gomez was. The regulations also require that the passport be stamped in that situation and that an I-94 card be issued to the alien. Stamped on his return? Stamped on his return at IH. Yes, that's correct. I understand. I'm not, I don't mean to interrupt your answer. So it was stamped in El Salvador. It was stamped in El Salvador, both on his entry to El Salvador and on his exit, but it was not stamped for whatever reason. We don't know why. We can only theorize at IH, that's correct. But there's no dispute that customarily it would have been stamped for a person in his status. There's no dispute. I agree with that, Your Honor. Yes, there's no dispute, which means that the INS official must have made a mistake, which happens all the time, and that's in fact why we have the procedural regularity standard under Quilanton and Areguin, which is a very low standard. All it requires is that the alien present himself for inspection and then be waived into the United States, and that's actually what happened. My impression, I know this isn't in this record, so correct me, but customarily people who are arriving on a plane in a controlled environment, such as an airport, have to be in a line and pass through a booth where there's an officer there who is busy stamping document after passport. You know this, of course, but it sort of defies common sense that a particular person would be passing through those controlled facilities and not receive the property. It's not a chaotic situation. It's a very well-organized situation. Correct me if I've got it wrong. I don't disagree with you, Your Honor, and as I stated, we can only theorize as to what happened. One theory is that permanent residents, when they enter the United States, they are not required to have their passports stamped. They're required to hand their permanent resident card to the INS officials and the officials hand it back and allow them to enter the U.S. Mr. Gomez was not a permanent resident, but— Well, in what you just described, there's no stamp given— There's no stamp given. —on the document or the passport. Is that right? No. So if the INS official was busy or if he was inexperienced, he may have seen that temporary resident card, which is, in fact, green, and he may have concluded that the proper procedure was to hand it back to Mr. Gomez and allow him to enter the United States. All right. And does he give a form, too? Is it I-49? It's called an I-94, Your Honor. It is a paper form, and what that paper form states is that the alien has a certain amount of time that he can remain in the United States. We're not exactly certain why the regulations require an I-94 to be issued to a temporary resident because the temporary resident's card already has an expiration date on it, and we don't know whether that played a factor in this case as to why Mr. Gomez was not issued an I-94. Is there a record made on the custom officer's side showing that he gave that form? Sometimes there is, Your Honor, and you can file a form, and I believe it's called an I-102. There may be some record out there in a DHS warehouse somewhere that would establish that Mr. Gomez was admitted. Unfortunately, we took this case with only a few days to file a motion to reopen to the BIA and would not have been able to get that on the record, and to the extent that prior counsel didn't do it, we're alleging that he committed ineffective assistance of counsel in the United States. I just want to be sure. Is it your position that he received an I-94 and misplaced it, or that he never received one? I believe, Your Honor, that he never received one. Prior counsel in his brief to the Board of Immigration Appeals stated that he believed that Mr. Gomez received one and lost it. There's just no way to know which one of those is true. Certainly, Mr. Gomez never said that in an affidavit, and so we simply don't know, Your Honor. Given that he preserved all of these other documents for nearly 20 years, I find it rather unlikely that he received an I-94 card and lost it, but anything is possible. The three difficulties I often approach issues this way, when they're difficult like this one, is sort of legal, policy, and facts. So legally, I hope you'll address the Ninth Circuit Hernandez appeasement. Exactly. Actually, what concerns me is, is Mendoza, the lawyer before, when he had the Lizada factors require him to give a response, and in that response, he just says his testimony was somewhat not credible. He mistakenly signed the, I wasn't inspected, just a little list you know that would mean, for us reviewing, that's substantial evidence to affirm. So legally, Hernandez, just the standard of review is, even as prior counsel said, you know, if they go the other way, we just can't prove. And then going forward, my biggest concern is a temporary, someone with a temporary resident status who never leaves, cannot adjust. So the fact that the government gives him the courtesy to leave to see his father, puts him in an advantageous position over anybody else who had the same status that discretionarily the government didn't let go. That's a problem for me. To the extent that the, the INS made a policy determination in writing its regulations that temporary residents would be allowed to travel, they must have considered the possibility that some of them would travel, and that they would return. But they didn't. It's subject to inspection. Their interpretation may be entitled to skid more deference, is you don't, right? You don't get to get a benefit nobody else does. We're giving you a courtesy. So they haven't made that determination, they're disputing that. Again, Your Honor, I think that they are, they are making an argument as to that Mr. Gomez shouldn't receive a permanent benefit from temporary resident status. Number one, I think that that's a, that is a policy argument, and we're arguing here about the interpretation of a regulation and a statute, and skid more deference does come into that. But Your Honor, to the extent that the, the, I'm sorry, Your Honor, could you answer the question? You asked a long question. You're on point. You're on point. I think what, I may be mistaken, they can correct it. Their view is Hernandez is a circuit decision. They do have some subsequent BIA applications of it, albeit a little bit chaotic, and therefore they would favor that, that it sort of works to undo the admission. The readmission is not an admission, like the parole world. Right, and I think we're talking about, to the extent we're talking about undoing an admission, we're not dealing really with a policy question, Your Honor, we're dealing with a legal question, what is the actual effect of 8 CFR 245 8.2 U4? I mean, there are a lot of problems with the government's theory, even, even if we assume that the INS should have had a policy that people who, who left the U.S. and returned pursuant to temporary resident status, that somehow they should not be permitted to adjust their status as a result of that admission. Even if that's the case, what we're talking about here is the effect of, of a law, Your Honor. We're talking about the effect of the regulation. The regulation simply doesn't say what the government wants it to say. But then the Ninth Circuit's wrong. No, I actually don't think that the Ninth Circuit is wrong. And to distinguish what the Ninth Circuit did and what Hernandez Arias was arguing from what we are arguing, Hernandez Arias was arguing that he was admitted to the United States as a result of his temporary resident adjustment of status. Hernandez Arias never left the United States and was readmitted through a port of entry pursuant to 8 U.S.C. 1101 A13A. And this Court has, has referred to that type of admission in, in the case of Tula Rubio as a traditional admission. That's what the definition of admission has always been, even actually before IHRA-IHRA. The BIA case of Arreguin goes back to 1941, and admission requires an entry into the United States. So Hernandez Arias is saying, my temporary resident adjustment of status was my admission, and the Ninth Circuit says, no, because your temporary resident status expired. Mr. Gomez isn't relying on his temporary resident adjustment of status. He's relying on his admission to the United States through a port of entry. His physical admission. His factual admission. And that gets you to just, are you saying that there was no substantial evidence? In light of what Mendoza said, and what the IJ and the BIA all feel? I'm saying that there, yes, there was not substantial evidence, Your Honor. The evidence, in fact, is all on our side. There's, Mr. Gomez provided not only his consistent testimony that he entered the U.S. But the IJ found him to be inconsistent. When, when he testifies, even his date of birth gets extremely unclear. The IJ, the IJ specifically finds him to not have any credibility issues as to his entry into the U.S., and that's on the record, page 447. So there is some dispute. I'm glad you, I didn't, I wasn't, how can that be harmonized with the IJ's finding? Or is that your point? It can't be. Um. But the IJ didn't conclude that. No, the IJ concluded, the IJ specifically says, any credibility issues do not affect the issue at hand. That's page 447. And the issue at hand was whether, whether Mr. Gomez entered the U.S. on March 1st, 1993. So there's no dispute about that. Which is why it's a little funny that we're here, Your Honor, arguing about it. Um. But what about the declaration that he was, was not legally admitted, that he entered the country without permission? Didn't he say that on the form? We're referring to the, the TPS applications, Your Honor. Inspection, yeah. Right, right. The TPS applications, there's a question on there that says, how did you enter the United States? That question is actually ambiguous. It doesn't say, how did you enter the United States most recently? It just says, how did you enter the United States? I believe that's on page, is it 517 of the record, Your Honor? It's near the back. Um. So what, what was, what was going on when he answered that questionnaire, and what was under it? Um. Well, again, what the question says is, is, uh, how did you enter the U.S.? And it says EWI.  And his. What was the purpose of the question? The purpose of the question, there really is no purpose to it, actually, in regards to TPS. I mean, what was the purpose of it? It's a, it's a, it's an application for temporary protected status, Your Honor. And there really is no purpose to the question, uh, how did you enter the United States? Because a person qualifies for TPS whether they entered the United States with inspection or not. And so the paralegals, when they fill this out, they put EWI. To assume, uh, that there's an inference that Mr. Gomez was, was making a representation that he actually entered, uh, without inspection the, the most recent time, we'd have to assume a couple of different things. Number one, we'd have to assume that he knows what EWI stands for, which he doesn't. Number two, we would have to assume that even if he knows that EWI stands for entry without inspection, that he would know what that means. And he testified on the record that he doesn't know what entry without inspection means. But all that, Mendoza did present all that. They continued the hearings, continued, he's on the stand. The IJ heard that innocent explanation. Correct. Right. And the IJ didn't actually rely on any, um, representation made on the TPS applications. That got picked up somehow in the BIA's decision. And our position is that this was all affected by ineffective assistance of counsel, failure to argue properly the issues, and to bring the facts to, to the court's attention. The BIA seemed to think that he twice made that admission, that he had entered, that he had not entered. Yes. It's, it's two different TPS applications. The most recent of which was actually filled out by the prior counsel in this case who were alleging was ineffective. The previous one in 2005, we don't know who filled that one out, but again, both of them say EWI. And assuming Mr. Gomez read that application before he signed it, we would have to assume that he knows what EWI means, which he's, he's not that sophisticated of a litigant. If we prevail, then this case goes back to the immigration court for a hearing on adjustment of status. Now, Your Honor, I have about a minute and a half left. I would like to address footnote three in Hernandez-Arias. That's the best place to look to distinguish between what Hernandez-Arias is talking about, which is an admission under the Immigration Reform and Control Act. The, the Ninth Circuit actually re-released this opinion in August of 2014 solely to add this footnote. And specifically, they distinguish our case in this footnote. They say, and, and the footnote is at the beginning of the opinion and in the footnote. And what the Ninth Circuit says is you've got two things in the Immigration and Nationality Act, both of which we're going to call admission. One of them is the traditional definition of admission under IRA-IRA, but like I said, it goes back to at least 1940. And that is a procedural event. All it requires is that the alien present himself for inspection and then be allowed into the country. It's a fact. The other type of admission that the Ninth Circuit talks about is, is something that was created by the Immigration Reform and Control Act for the, the amnesty statutes and regulations. And they call this a definition, a regulatory definition of admission unknown elsewhere in immigration law. And the Ninth Circuit goes on to say, we limit the effect of our holding and our discussion of rescission and termination of status to those admissions arising under the provisions for adjustment to lawful temporary resident status authorized by 8 U.S.C. 1255 AA and implemented at 8 CFR 245 A.2. So the Ninth Circuit knew that, that this, that this case would come up and they said, look, what we're talking about, this, this regulation which, which limits or, or terminates a, a, an admission only applies to this status-based admission under IRCA. In this case, we're talking about a procedural event admission, admission of fact under IRIRA. And Your Honor, I would just want to leave you with this. Facts don't expire. Statuses expire, but facts don't expire. And so in this case, that regulation can't have the effect of undoing or nullifying that admission on March 1st, 1993. With that, Your Honors, I will preserve the rest of my time. Thank you very much. Cori? May it please the Court, Jennifer Cori on behalf of Attorney General Lynch. I'm going to take on the regulatory aspect of this case first, because I believe that it's dispositive as to the whole case. So whether the, so the one dispositive issue in this case is whether the agency reasonably interpreted 8 CFR 245 A2 U4 to automatically revert Gomez to his prior lawful unadmitted status upon termination of Gomez's temporary residence status in 1993, regardless of whether Gomez was admitted when he returned from El Salvador in March 1993. Differentiating between whether he adjusted and when that constitutes an admission or this present admission, the government does not believe it makes any difference here. Because the text of the statute, of the regulation itself, the plain language says, the termination of the status of any alien previously adjusted to lawful temporary residence under section 245 AA of the act shall act to return such alien to the unlawful status held prior to the adjustment and render him or her amenable to exclusion or deportation proceedings. As the Ninth Circuit found, if we were to read that as not, as not negating any admission pursuant to temporary residence status, that would in effect nullify the text of the statute, it would make it mean nothing. So before becoming a resident, a temporary resident, Gomez's unlawful status was as an alien present without admission or parole. The second that his temporary status terminated, according to the regulation, he returned to the unlawful status held prior to the adjustment. Again, he returned to his status as a alien present without admission or parole. And this also, so as far as how the Ninth Circuit treated adjustment as an admission, they treated it, and they do in their, like Negrete Ramirez in their case law discussing adjustment as admission. They treat it exactly as an admission through a port of entry. So as they said in that case, as with lawful admission for permanent residence, lawful admission for temporary residence involves the statutory fiction of an administrative inspection by immigration officials, coupled with legal permission to remain in the United States. Therefore, they made no distinction between a port of entry admission and an adjustment admission. The policy of the temporary residency under IRCA also supports the board's interpretation of ACFR 245A2U4. As Hernandez-Arias also found, fairly read. The regulation describes a limited form of status with no lasting immigration benefit. So 245A2B states that an alien whose status is adjusted to that of a lawful temporary resident is not entitled to any benefit or consideration accorded under the act to aliens lawfully admitted for permanent residence. Accordingly, to the extent that admission could be construed as a lasting immigration benefit conferred upon lawful permanent residents, that similar treatment of temporary residence is foreclosed under the governing regulation. And as the court has pointed out, it wasn't meant to distinguish between people who, and treat aliens more favorably who left the United States during their temporary residency than those who didn't. As to- I'll mispronounce it, Quilantan? Quilantan. Quilantan, the vehicle case. Their lawful entry isn't a prerequisite for admittance. So the fact of admittance is not equivalent to the status concern. I'm sorry, I'm sorry. Right? In that case, the holding, the specific reasoning was that the lawfulness of the entry doesn't constitute, doesn't affect the factual admission question. Correct. So we disaggregate status from admission, and the difficulty with the government's argument here is the use in your brief of words like expunge and rescind the factual truth of an entry. Right, but it's only limited to this 245. But that would make sense, and I may not understand these regs, so both of you can clarify. But it seems like the regs and the law's been written precisely the way you suggested for the parole and advanced parole concept. You get to go on advanced parole travel, but the law's very clear that will not qualify as an admission. But there is no parallel language for this temporary resident travel. You're right, there isn't. So that looks distressing to me to suggest that we should read into what the law explicitly says in another parallel context. Well, I mean, this regulation was written for a reason this way, and that the only way that this makes sense is if admission, if any admission is nullified once the temporary status is terminated. Does that make any? Well, that's the government's argument, and that was the motion to pre-termit that maybe Mr. Mendoza didn't, or I think not just maybe, he didn't anticipate, he didn't defend on that legal approach that I see. So that's been your argument. That has been our argument, yes. And I believe that is the correct argument. Let me just ask you something. We found what appeared to us to be conflicting BIA opinions on interpretation of this reg. Castro Valdez is one in 2012, and Zacina Osario in 2015, are you familiar with those? I'm not, I have other BIA opinions, I'm sorry, but I am not familiar with those. We might get you to give us a little supplemental brief on that. Okay. Castro Valdez is 2012 Westlaw 3911586. And Zacina Osario is 2015 Westlaw 4537062. I'd be happy to do that, I'm sorry that I'm not familiar with those. Yeah, both sides are simultaneous, and then we'll see if we need any more briefing. Okay. You've got a lot of time, but I think, in my mind, you made the right, well, I shouldn't say that. Just on the factual contention, when I went back to the hearings, it didn't look like the government crossed Mr. Gomez much to suggest he didn't enter that airport. Right. And it would seem highly illogical that he would not have lawfully entered, because you agree the temporary status made it perfectly acceptable for him to enter. Well, yes, but there's a lot of holes in this. Can I- Yeah, absolutely. There's a lot of holes in this record. First of all, the first one that pops out is that we don't actually know when he entered. So, we don't actually know when he entered initially. He testified at one point- You mean in 93? In 83. That's not really well. Well, right. Well, it is in a way. So, if he entered in 83, he actually would not have been eligible for the temporary resident status. The government hasn't pressed that in the- No, no. I'm just- Because Petitioner suggests that the government hasn't actually given any alternative theories as to how he could have gotten to Houston, but then not been admitted, to the extent that he argues that in his reply brief, I just want to respond to that. First of all, I mean, it's not our burden of proof to present alternative theories. But should he have been given temporary resident status erroneously, let's say, because he was inconsistent as to when he actually entered the United States. Maybe he didn't want to be admitted on the way back, didn't want to present himself in inspection and have inspection on the way back. But you didn't cross him on that at all when he took the stand in the hearings. It's a plausible response to- Right, just to his theory. Just on that 93 entry, if he has a temporary resident status and it's stamped that he's leaving whatever, Honduras or wherever he's going from. Right. It's also equally as implausible that his passport wouldn't have been stamped in Houston. Well, we don't have anything in the record on, in 1993, what government record retention- Yeah, I actually looked into that and there is no, they don't have any record of it. They wouldn't have any record of it.  It's-  Right. But I, the fact that he does not have his I-94, he testified at one point to saying that he lost it, at one point to saying that he doesn't have it anymore. And yet he retained these boarding passes, or the boarding pass and these baggage certificates. It all, it doesn't add up to him meeting his burden of proof. It is not the government's, it's not the government's onus to- Is significant evidence equivalent to plausible? No, significant evidence is more than plausible. Well, I mean, how can you say that it's plausible for a man who had no reason to somehow get around the inspection would do that? I mean, how is that plausible? It's his, we don't know that he had no reason. There are a lot of holes. In fact, we don't know when it's, exactly when his temporary status expired, although- Nobody's come up with a reason that I'm- Right, right. But I'm, you're right that we didn't, it was not crossed. But should he have left the country for more than 30 days and then therefore couldn't have been, would have needed advance parole to come back in? The stamps on his Salvadorian passport, one of them doesn't even have a year. We do see the March 1st, 1993 on there, but the other one has no year on there. Again, there's no stamp on this side of things, no I-94, and yet he's kept apparently every other piece of paper that was given to him on that day. And so, government just stands on the argument that he did not meet his burden of proof of showing that he was admitted in 1993. One question, because I asked your opposing counsel this, but is, does the government have discretion to not allow someone on temporary residence status to travel and travel back? Is that a courtesy that's extended that if the court were to interpret this law, that that entire benefit to a class of people would evaporate? It's a courtesy extended- Is it a courtesy under the law? No, no. Okay. It's a courtesy extended once you get it. Every one of them. But then, yes, but then you can be admitted. Within 30 days or 90 days aggregate, you do not need to get advance parole. If the court has no further questions, thank you. Okay, Mr. White. May it please the court, Curtis George White, appearing as co-counsel for Petitioner Simon Gomez. And in rebuttal to the government, we at first point to some parts of the record regarding the entry of Mr. Gomez to the United States. The government trial attorney effectively conceded entry into the United States and credibility as to that point. Pages 447, 448 of the record. The IJ concurred with that. And in fact, the TA calls it an admission at one point on page, that was 448 of the record, and says she needs to produce a 261, which refers to an amendment to the notice to appear, meaning that she needed to change the charge of removability from entry without inspection to overstaying an authorized period of stay. Notably, the motion to pre-termit doesn't dispute the entry itself. And the entry itself really isn't disputed below. The government talks about the plausibility of Mr. Gomez entering the United States. And the IJ himself noted that, and this is page 431 of the record, the IJ noted that if Gomez had the card, it wouldn't make any sense for him not to use it, referring to the temporary resident card, which did have a travel authorization. And the government agreed on the same page. And this fact, and this evidence reflects and compels the finding that he did enter the United States in 1993, and that an immigration officer allowed him into the United States. That's through the testimony, through Mr. Gomez's affidavit. It is your burden, and the government only has to produce substantial evidence, and you do have those admissions in the record, the form that was filled out. Why isn't that substantial evidence? Yes, going to the TPS applications, again, the TPS application asks for a date of entry. It doesn't say date of first entry. It doesn't say the date of last entry. So the fact that he puts 1983, that's the correct way of filling out the form. Now, the BIA, and that wasn't really an issue for the IJ, but the BIA took that up as an issue, and that's erroneous. The BIA, in its decision, says that Mr. Gomez said that was his last entry, when that's not the case on the TPS form itself. And the... And your thought on the Mendoza letter responding to Lizardo, where he too says there just wasn't enough proof? That's part of his ineffectiveness, is that... But he got continuance after continuance. That's correct. In other words, the government wasn't hammering your client on this point, and the IJ wasn't. They were really saying, get us something better, get us something better. And the confusion was... The pre-term mission letter comes in legally. The confusion was, what regulation... What effect does the regulation have on his entry? Does that mean that it's not an admission? And Mr. Mendoza, prior counsel, never addressed that point. Didn't. Failed to respond to the motion pre-terminate, and Mr. Gomez was substantially prejudiced. Thereby, an order of removal entered, and the BIA abused its discretion in finding that there wasn't substantial prejudice when it's clear that there was. And again, the agency's view with the regulation is simply inconsistent with Fernandez-Harris footnote three. It's inconsistent with the INA, the statutory definition of admission. As Your Honor pointed out, Judge Higginson, Congress knows how to limit admissions. In 8 U.S.C. 1101, A13B, it says, okay, if you enter with parole, that's a port of entry, entry into the United States, but that's not an admission. So Congress knows how to limit admissions. No one's arguing that a readmission isn't an admission. I still just have difficulty thinking the entire class of temporary status people who don't go see their father will never be able to adjust, but by virtue of him being able to go back and then come in, it triggers the adjustment. It just seems like an incongruity, but you're saying that's how it was written? Yes, Your Honor. And the INA allows people who travel with temporary protected status who didn't have a prior lawful admission, it allows them to come back on parole and still adjust their status. And time has run out if there's any other questions from the court. All right. Thank you very much. Thank you. Thank you. And